PEOPLE v SMITH

Docket No. 209326. Submitted January 11, 2000, at Lansing. Decided
December 15, 2000, at 9:25 A.M. Leave to appeal sought.

Steven D. Smith was convicted by a jury in the Washtenaw Circuit
Court, David S. Swartz, J., of first-degree criminal sexual conduct,
armed robbery, possession of a firearm by a felon, and possession
of a firearm during the commission of a felony. The defendant
appealed, alleging, in part, error in the admission of evidence.

The Court of Appeals *held*:

1. A four-part test is applied to determine whether other bad acts
evidence is admissible when the proponent of the evidence uses it
to show identification through modus operandi. There must be sub-
stantial evidence that the defendant actually perpetrated the bad
act sought to be introduced. There must be some special quality or
circumstance of the bad act tending to prove the defendant's iden-
tity or the motive, intent, absence of mistake or accident, scheme,
plan or system in doing the act, or opportunity, preparation, and
knowledge. One or more of these factors must be material to the
determination of the defendant's guilt of the charged offense. The
probative value of the evidence sought to be introduced must not
be substantially outweighed by the danger of unfair prejudice.

2. The court did not apply the proper test in determining whether
bad acts evidence regarding a robbery at a school should be admit-
ted. However, application of the proper test shows that the court
reached the correct result in admitting the evidence and did not
commit error requiring reversal.

3. The court did not apply the proper test in admitting bad acts
evidence regarding a hotel robbery. Application of the proper test
shows that the court abused its discretion in admitting the evi-
dence. However, an examination of the entire cause shows that it
is more probable than not that the error was harmless rather than
outcome determinative. The defendant is not entitled to relief on
this basis.

4. The court erred in admitting under MRE 804(b)(6) evidence
concerning the defendant's communication with his wife, because
defendant had invoked both the spousal privilege and the marital
communication privilege. Hearsay testimony regarding statements

the wife made to the police and to a neighbor did not show a particularized guarantee of trustworthiness. The court erred in concluding that the statements were trustworthy and, thus, admissible under MRE 804(b)(6). The error was harmless beyond a reasonable doubt, however, and reversal is not required.

5. The jury was properly instructed regarding the appropriate use of the similar acts evidence.

Affirmed.

1. CRIMINAL LAW — EVIDENCE — OTHER BAD ACTS — IDENTIFICATION — MODUS OPERANDI.

A four-part test is employed to show whether evidence of a defendant's other bad acts is admissible where the evidence is offered to show identification through modus operandi: there must be substantial evidence that the defendant committed the bad act; there must be some special quality or circumstance of the bad act tending to prove the defendant's identity or the motive, intent, absence of mistake or accident, scheme, plan or system in doing the act, or opportunity, preparation, and knowledge; one or more of the factors must be material to the determination of the defendant's guilt of the charged offense; and the probative value of the evidence sought to be introduced must not be substantially outweighed by the danger of unfair prejudice.

2. WITNESSES — HUSBAND AND WIFE — SPOUSAL PRIVILEGE.

The spousal privilege, which is applicable only when the witness and the spouse are married at the time of trial, bars one spouse from testifying for or against the other without the other's consent except in actions for divorce, prosecutions for bigamy or for a crime committed against the children of either or both, actions growing out of a personal wrong or injury done by one to the other or the refusal or neglect to furnish the spouse or children with suitable support, cases of desertion or abandonment, and certain cases relating to the marriage and title to property (MCL 600.2162; MSA 27A.2162).

3. WITNESSES — HUSBAND AND WIFE — MARITAL COMMUNICATION PRIVILEGE — SPOUSAL PRIVILEGE.

The marital communication privilege under the Revised Judicature Act bars a spouse from testifying regarding any communications made by one spouse to the other during the marriage without the consent of the other spouse regardless of whether the testimony is sought during or after the marriage as long as the communication occurred during the marriage; exceptions enumerated in the act with respect to the spousal privilege do not apply to the marital communication privilege (MCL 600.2162; MSA 27A.2162).

4. EVIDENCE — HEARSAY STATEMENTS — EXCEPTIONS.

    A statement sought to be admitted into evidence under the hearsay exception in MRE 804(b)(6) must qualify under the rules of evidence and admission of the statement must be consistent with the rights embodied in the Confrontation Clause of the Sixth Amendment; the statement must show a particularized guarantee of trustworthiness after a consideration of the totality of the circumstances; relevant circumstances include only those surrounding the making of the statement that render the declarant particularly worthy of belief; corroborating evidence cannot justify admitting an otherwise untrustworthy statement.

*Jennifer M. Granholm,* Attorney General, *Thomas L. Casey,* Solicitor General, *Brian L. Mackie,* Prosecuting Attorney, and *Lenore M. Ferber,* Assistant Prosecuting Attorney, for the people.

*Carolyn A. Blanchard,* for the defendant on appeal.

Before: WHITBECK, P.J., and HOEKSTRA and OWENS, JJ.

PER CURIAM. Defendant Steven Smith appeals as of right his jury convictions of first-degree criminal sexual conduct, MCL 750.520b(1)(e); MSA 28.788(2)(1)(e), armed robbery, MCL 750.529; MSA 28.797, possession of a firearm by a felon, MCL 750.224f; MSA 28.421(6), and possession of a firearm during the commission of a felony, MCL 750.227b; MSA 28.424(2). The trial court sentenced defendant to serve concurrent sentences of forty to sixty years' imprisonment for the criminal sexual conduct and armed robbery convictions, as well as three to five years' imprisonment for the conviction of possession of a firearm by a felon. These sentences are preceded by the mandatory two-year sentence for his conviction of possession of a firearm during the commission of a felony. We affirm.

## I. FACTS AND PROCEDURAL HISTORY

### A. THE CHARGED OFFENSES

This case arises out of a sexual assault and robbery that occurred in the early morning hours outside a University of Michigan dormitory in Ann Arbor. These offenses were followed by a series of other crimes that concerned the Ann Arbor community. Because there are multiple victims in this case, we refer to them with pseudonyms to avoid the confusion that would result from calling each of them "the victim."

At approximately 8:00 A.M. on Saturday, October 5, 1996, a woman (Jane Doe) left her dormitory room at Bursley Hall. As she left the building, she noticed a man dressed all in black and wearing a hooded sweatshirt standing at the bus stop about ten to fifteen feet from the door. Several moments later, as she reached her car, a man approached her from behind, put a pistol to her head, and then forced her into her car. The assailant entered the car after she did and sat in the driver's seat. He ordered her not to look at him and then told Doe to give him her wallet. As the woman did so, she glanced at the assailant several times until he told her to turn around and look out the window.

After the assailant combed through Doe's wallet, he told her to unfasten her pants and he put his fingers inside her vagina. Next, when he told her to remove her pants, she began crying uncontrollably. According to Doe, at that point the assailant must have decided that "it wasn't worth it" because he got out of the car and told her to keep her head below the dashboard for five minutes. Approximately one minute later, she heard a car speed past her and she tried to look out the window, but could not see anything because the

window had fogged. After the assault, Doe checked her wallet and discovered that all the money, between $25 and $30, was gone.

Doe described her assailant to the police as a black male, 5'6" or 5'7", dressed in black shoes, black jeans or sweat pants, and a black hooded sweatshirt worn with the hood up. Although he wore a navy blue bandanna across the lower portion of his face, the bandanna slipped at one point during the attack. On the basis of a glimpse she got when the bandanna slipped, she believed that the man she had seen standing at the bus stop that morning was the same individual who had attacked her in her car. The pistol he carried was a two-tone silver semiautomatic with bronze on the sides.[1]

### B. OTHER OFFENSES

#### (1) SLAUSON MIDDLE SCHOOL

A few days after the assault and robbery charged in this case, a woman (Jane Jones) who worked at the Slauson Middle School arrived at the school at about 6:35 A.M. A white, "beat up," "rusty" car pulled into the parking lot shortly after she arrived there. Because it was her responsibility to open the school building early each morning, Jones was not accustomed to seeing other cars at the school when she arrived. She became scared when the car drove slowly past her and stopped a few car lengths away, so she locked her car doors and stayed in the car. The white car left

---

[1] During the trial, Doe described the pistol as small and flat-sided, with silver and gold by the barrel.

immediately after a co-worker's car pulled into the lot.

A secretary at the school (Jane Miller) was not so lucky. She arrived at the school sometime between 6:40 A.M. and 6:45 A.M. She parked her car and, as she got out of the car, someone grabbed her from behind. A man told her to get back into her car. When she refused, the man told her to do as he said because he did not want to hurt her. He put his hand over her mouth, pulled her head to the side, and shoved a shiny metal object about three inches long between her eyes and only one inch from her face. She thought the object was a knife because it was small and because of the way the man held it; however, she could not focus on the object because it was so close to her face. Miller and her attacker struggled for a moment and ended up staring each other in the face. He then picked up her purse, which she had dropped during the struggle, and ran away from the school. Miller described her assailant to the police as a 5'7" to 5'9" tall African-American man with a medium complexion and medium build. He wore a dark, navy blue jacket with a hood covering his head.

### (2) CLARION HOTEL

A woman (Jane White) was working in the front lobby of the Clarion Hotel in Ann Arbor at approximately 4:00 A.M. in mid-October 1996 when a man holding a pistol walked in and directed her to open the cash drawers and give him the money. She gave the man approximately $500 to $650 and then he slowly walked out of the lobby. One $100 bill and at least one roll of quarters packaged in a standard bank roll were among the cash she gave him. White

described the robber as approximately 5′5″ to 5′6″ tall. He wore a black jacket with the word "Spurs" across the back and had a dark scarf across the lower portion of his face. His pistol was small, about the size of his hand, and was a "silver chrome" color.

### C. THE POLICE INVESTIGATION

Detective Michael Schubring of the Ann Arbor Police Department was assigned to investigate the Slauson Middle School robbery. He had been sharing information regarding his investigation with the University of Michigan Department of Public Safety when, on October 15, 1996, he received information that two suspects, defendant and his wife, Wendy Smith, had been arrested in connection with these crimes and were being held at the Ann Arbor Police Department.

After Schubring advised Wendy Smith of her *Miranda*[2] rights, she reportedly told him that she and defendant had argued on the morning they were arrested. They decided to go for a drive at 3:00 A.M. or 4:00 A.M. so that they would not disturb other family members who were living in their apartment. Defendant drove them to a gasoline station on Victors Way.

At this point in the interview, Schubring interjected that the police were investigating a series of early morning robberies and sexual assaults, which included the crimes at the University of Michigan, Slauson Middle School, and the Clarion Hotel, as well as a robbery at a local Subway restaurant. Wendy Smith stated that defendant was at home in bed with

---

[2] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

her at the time of each of those offenses. Schubring then left the interrogation room for approximately one hour, during which time he interviewed defendant. When Schubring returned to the room where Wendy Smith was waiting, she stated that even though she had been truthful regarding why she and her husband went for a drive during the early morning hours on the day they were arrested, she had lied about several other matters. She stated that, in reality, when they were driving down Victors Way, defendant saw a police patrol car and stated, "I got to get rid of this gun." He then threw a small gold and silver pistol out the window of his car somewhere along Victors Way.

Wendy Smith told Schubring that, on the day of the Clarion Hotel robbery, defendant asked to use her car approximately thirty minutes before the robbery occurred and was gone for approximately one hour. On the day of the Subway incident, defendant had gone out for an extended period on foot and definitely did not have her car. However, she believed that defendant did have the car on the day of the Slauson Middle School robbery. She also noted that their oldest son was a student at that school, so her husband was familiar with that area.

Relying on Wendy Smith's description of the area along Victors Way where defendant tossed the pistol, the police found a pistol several feet away from the curb. The pistol was a Titan .25 caliber semiautomatic with five aluminum rounds in the magazine. It had a blue steel barrel with a gold-plated slide. In his twenty-four years as a police officer, Schubring had never seen another pistol like it. Later, when the

police showed this pistol to Doe, she stated that she had no doubt it was the pistol her attacker used.

After locating the pistol, Schubring obtained a search warrant and executed it at defendant's home. Officers found a box of ammunition on the top of the dresser, which contained eight aluminum rounds identical to the rounds found in the pistol located on Victors Way. They also found in the pocket of a denim jacket $240 in paper currency and a $10 roll of quarters packaged in a standard orange and white bank roll; the paper currency consisted of one $100 bill, as well as three $20 bills, two $10 bills, one $5 bill, and fifty-five $1 bills. Sergeant Kevin McNulty of the University of Michigan Public Safety Department found a black hooded sweatshirt, black sweat pants, and a pair of black jeans in the apartment.

Crystal Smith, defendant's neighbor, contacted Schubring after the search. Their discussion convinced Schubring to interview Wendy Smith a second time. During this second interview, which occurred outside Wendy Smith's home, Wendy Smith stated that defendant, while in jail, had asked her to contact either Crystal Smith or a woman named Deborah to ask one of them to file a false police report indicating that they had been recently robbed and raped by a thin, black male wearing a bandanna.[3] Wendy Smith also told Schubring that, although she did not want to help defendant in this way, she did so because she feared him.

---

[3] Crystal Smith corroborated that Wendy Smith asked her to file a false police report and added that she refused this request.

D. NOTICE OF PRIOR BAD ACTS EVIDENCE

Before trial, the prosecutor advised the defense that she intended to present evidence regarding robberies at the Clarion Hotel and Slauson Middle School to the jury. The prosecutor alleged that defendant perpetrated those crimes and that the facts of those offenses were relevant to identifying him as the attacker in this case. The prosecutor provided defendant with a chart that graphically demonstrated the similarities between the crimes.

Defendant filed written objections to the prosecutor's plan to introduce that evidence and, at a hearing in mid-September 1997, he moved to suppress the evidence. He argued that these additional crimes were not sufficiently similar to the instant offenses to be relevant to identification. Therefore, he argued, the evidence of these other crimes would be more prejudicial than probative and, thus, inadmissible.

In response, the prosecutor argued that even though a few aspects of each crime varied, the overall circumstances presented in each incident were sufficiently similar to allow a reasonable trier of fact to determine that defendant was the assailant in each of these cases. The trial court agreed and ruled that the prosecutor could offer evidence of the Clarion Hotel and Slauson Middle School crimes at trial. The trial court also offered to read a limiting instruction to the jury to cushion the prejudicial effect this evidence would have on defendant. In making its ruling, the trial court stated that it relied on the test for admissibility articulated in *People v VanderVliet*, 444 Mich 52, 55; 508 NW2d 114 (1993), amended 445 Mich 1205 (1994).

### E. TRIAL

At trial, Doe identified defendant as the man who had robbed and sexually assaulted her. She commented that she had described to the police what she could see of defendant without the bandanna on his face and as he stood at the bus stop earlier on the morning of the offense so that the police could prepare a composite drawing. However, Doe admitted that during a photographic lineup conducted after the attack, she identified someone other than defendant as the assailant and that when she saw defendant's picture in the newspaper she was not sure he had attacked her. Doe stated, however, that she saw defendant at the preliminary examination and when she looked into his eyes, she was certain that he was her assailant. She reiterated that she had "[n]o doubt" regarding his identity as her attacker.

Similarly, Miller stated that she had no doubt that defendant was the man who had attacked her at Slauson Middle School. Indeed, when she had previously seen defendant's picture in the newspaper, she immediately recognized him as her assailant before she even read the accompanying article.

Jones, the other Slauson Middle School employee who saw the suspicious car at the school on the morning of the robbery, also testified at trial. When shown a photograph of Smith's car, she said that it looked like the car she saw at the school that morning because it was the same shape and size, "beat up," "dented in" at the door, and rusty on the passenger side. However, Jones could not say with complete assurance that the car she saw belonged to defendant.

White, the employee who was robbed at the Clarion Hotel, testified regarding her attacker's description. Although, at the preliminary examination, she had described the robber as a black man wearing a black or navy blue sweatshirt with the hood over his head, neither the prosecutor nor defense counsel asked her the attacker's race at trial.

In addition to testimony by witnesses involved in the investigation of the instant offenses, the prosecutor introduced testimony by Bursley Hall employees who recalled seeing a car similar to defendant's car in shape, size, and color at the dormitory near the time of the offense.

Defendant presented no witnesses on his behalf.

At the close of the trial, the trial court instructed the jury regarding the proper use of this other acts[4] evidence:

> You have heard evidence that was introduced to show that the defendant committed crimes for which he is not on trial. If you believe this evidence, you must be very careful only to consider it for certain purposes. You may only think about whether this evidence tends to show that the defendant used a plan, scheme, or characteristic scheme that he has used before or since and/or who committed the crime that the defendant is charged with.
>
> You must not consider this evidence for any other purpose. For example, you must not decide that it shows that the defendant is a bad person or that he is likely to commit crimes. You must not convict the defendant here because you think that he is guilty of other bad conduct.
>
> All of the evidence must convince you beyond a reasonable doubt that the defendant committed the alleged crimes, or you must find him not guilty.

---

[4] We use the terms "other acts evidence," "prior bad acts evidence," and "similar acts evidence" interchangeably in this opinion.

Following these and other instructions, the jury con-
victed defendant.

II. PRIOR BAD ACTS EVIDENCE

A. PRESERVATION OF THE ISSUE AND STANDARD OF REVIEW

Defendant first argues that the trial court erred in
admitting the testimony regarding the Clarion Hotel
and Slauson Middle School robberies under MRE
404(b)(1). Defendant objected to this testimony, thus
preserving this issue for appeal. MRE 103(a)(1). A
trial court has discretion to determine whether evi-
dence is admissible, and its decision should be
reversed only when the trial court clearly abused its
discretion. *People v Bahoda*, 448 Mich 261, 263, 289-
290; 531 NW2d 659 (1995).

B. TESTING ADMISSIBILITY

MRE 404(b)(1) governs a trial court's decision to
admit or exclude prior bad acts evidence. It provides:

> Evidence of other crimes, wrongs, or acts is not admissi-
> ble to prove the character of a person in order to show
> action in conformity therewith. It may, however, be admis-
> sible for other purposes, such as proof of motive, opportu-
> nity, intent, preparation, scheme, plan, or system in doing
> an act, knowledge, identity, or absence of mistake or acci-
> dent when the same is material, whether such other crimes,
> wrongs, or acts are contemporaneous with, or prior or sub-
> sequent to the conduct at issue in the case. [*Id.*]

The majority in *VanderVliet, supra* at 55, set out a
four-legged test for a court to follow when determin-
ing whether to admit prior bad acts evidence at trial.
Prior bad acts evidence is admissible if (1) a party

offers it to prove "something other than a character to conduct theory" as prohibited by MRE 404(b); (2) the evidence fits the relevancy test articulated in MRE 402, as "enforced through Rule 104(b)"; and (3) the balancing test provided by MRE 403 demonstrates that the evidence is more probative of an issue at trial than substantially unfair to the party against whom it is offered, defendant in this case. *VanderVliet, supra* at 74-75. A fourth factor articulated in *VanderVliet,* which does not fully conform to the idea of a test expressed in the preceding three factors, suggests that a party may request a limiting instruction under MRE 105 if the trial court decides to admit the challenged evidence. *VanderVliet, supra* at 75.

Generally speaking, the *VanderVliet* test supplanted the previous test used to determine whether other acts evidence was admissible, which was enunciated in *People v Golochowicz*, 413 Mich 298, 308-309; 319 NW2d 518 (1982). See *VanderVliet, supra* at 66-72. Like *VanderVliet, Golochowicz* used a four-part test:

> (1) there must be substantial evidence that the defendant actually perpetrated the bad act sought to be introduced; (2) there must be some special quality or circumstance of the bad act tending to prove the defendant's identity or the motive, intent, absence of mistake or accident, scheme, plan or system in doing the act and, in light of the slightly different language of MRE 404(b) we add, opportunity, preparation and knowledge; (3) one or more of these factors must be material to the determination of the defendant's guilt of the charged offense; and (4) the probative value of the evidence sought to be introduced must not be substantially outweighed by the danger of unfair prejudice. [*Golochowicz, supra* at 309.]

The *Golochowicz* Court emphasized that, as concerns the first part of the test, there need not be evidence

that proves beyond a reasonable doubt that the defendant committed the other bad act. *Id.* at 309, n 6. Note, also, that the third and fourth parts of the *Golochowicz* test, relevance and prejudice, correspond to the second and third legs of the *VanderVliet* test. These are, after all, closely related tests.

If the *VanderVliet* test did, in fact, replace the *Golochowicz* test, why then should we consider the *Golochowicz* test in this case? Because this Court in *People v Ho*, 231 Mich App 178, 186; 585 NW2d 357 (1998), concluded that the *Golochowicz* test "remains valid" when the proponent of the other acts evidence uses it "to show identification through modus operandi." See also *VanderVliet, supra* at 66. As we explain in more detail below, this was the purpose for which the prosecutor asked the trial court to admit the evidence surrounding the Slauson Middle School and Clarion Hotel offenses. Further, although this Court and the Supreme Court have thoroughly examined other acts evidence in a series of opinions leading to *People v Sabin (After Remand)*, 463 Mich 43; 614 NW2d 888 (2000), under the test articulated in *VanderVliet, Sabin* did not involve a modus operandi theory. Accordingly, and because *Golochowicz* was specially crafted to test whether modus operandi evidence is admissible, neither *VanderVliet* nor its progeny, including *Sabin*, would have us apply any other test.

### C. ANALYSIS

The prosecutor in this case hoped to show that the circumstances of the offenses at Slauson Middle School and the Clarion Hotel were so similar to the offenses at Bursley Hall that it would be clear that

the same person, defendant, committed the charged offenses. In other words, if the offenses at Slauson Middle School and the Clarion Hotel had distinctive elements tied to defendant and those same distinctive elements appeared in the charged offenses, the jury would be able to infer that defendant committed the charged offenses. This is a classic way to prove identity through modus operandi, which means a "[m]ethod of operating or doing things." Black's Law Dictionary (6th ed); see also *Golochowicz, supra* at 310.

### (1) SLAUSON MIDDLE SCHOOL EVIDENCE

Turning to the first part of the test in *Golochowicz,* we note that, because the trial court applied the *VanderVliet* test, it did not consider whether there was "substantial evidence" that defendant committed the other bad acts the prosecutor wished to present to the jury. However, there is a distinct possibility that there was this measure of evidence available concerning the Slauson Middle School offense because Miller, the secretary who was attacked at the school, was able to describe her assailant to the police. That description fit defendant. Critically, Miller saw a photograph of defendant in the newspaper and immediately identified him as the person who had attacked her. She was also able to identify defendant as her attacker while testifying at trial. Added together, this was substantial evidence that defendant was the person who committed that offense.

The second part of the test requires a court to examine whether there was some "special quality or circumstance" of the Slauson Middle School offense that tended to prove defendant's identity. The trial

court did not specify what it considered the special quality or circumstance that linked the attack at the school with the charged offenses. Instead, it merely found that there were "sufficient similarities" to justify admitting the evidence. In fact, there were a number of special qualities or circumstances that linked the two crimes. Significantly, witnesses described a uniquely damaged white car near the scene of both crimes. That car was linked to defendant.[5]

In addition to similarities between the perpetrator's physical characteristics, the crimes were also committed in similar manners. Both crimes occurred at roughly the same time of the early morning, the offense at the school around 6:45 A.M. and the charged offenses at about 8:00 A.M. In both cases the assailant apparently "staked out" the place where the offense took place looking for a victim. He then forced or tried to force his victim into a car by grabbing her from behind and pressing a small silver weapon against her head. Doe was able to identify the weapon used against her as a unique pistol. Miller initially thought the weapon was a knife, but could not confirm the identity of the weapon. The perpetrator in both cases also stole money from his victim. In any event, while the charged offenses may not have been precisely identical to the offense at the Slauson Middle School, there are sufficient similarities that tend to prove that the same assailant committed both crimes.

As for the third part of the test, logical relevance tends to be a tricky point when examining evidence

---

[5] We are not certain whether, as a matter of legal title, defendant or his wife owned the car. Suffice it to say there is evidence that they both drove this battered white car.

questionably admissible under MRE 404(b)(1). As the Supreme Court noted in *People v Crawford*, 458 Mich 376, 387; 582 NW2d 785 (1998), there is a natural tendency to recite mechanically any of the proper purposes identified in the court rule to satisfy this requirement. In actuality, to satisfy logical relevancy, the proponent of other acts evidence must show a "relationship between the [challenged] evidence and a material fact at issue that must be demonstrated by reasonable inferences that make a material fact at issue more probable or less probable than it would be without the evidence." *Id.*; see also MRE 401. In this case, defendant's identity as the person who sexually assaulted and then robbed Doe was particularly at issue because the assailant wore a bandanna covering his face during most of the sexual assault and robbery. The similarities between the two offenses tended to prove that the same man committed them both. The evidence concerning the Slauson Middle School crime was, therefore, logically relevant because it had a tendency to prove who committed the charged offenses against Doe.

The final part under the *Golochowicz* test requires a court to consider whether the prejudice flowing from the evidence would substantially outweigh its probative value. This test comes from MRE 403. The trial court did not make any explicit findings concerning this issue. Undeniably, evidence of the offense at the Slauson Middle School coupled with the explicit suggestion that defendant committed that crime was likely to prejudice defendant. However, virtually all evidence introduced at trial by an opponent is specifically intended to prejudice the other party. Given the pressing need to prove that defendant was the person

who committed the charged crimes and the logical tendency for the offense against Miller to help demonstrate defendant's identity as Doe's assailant, we cannot say that the risk of prejudice substantially outweighed the probative value of this evidence.

While defendant contends that the trial court's decision to introduce this evidence without noting on the record how it balanced the prejudicial effect of the evidence against its probative value denied him due process, there is no merit to this argument. As *People v Vesnaugh*, 128 Mich App 440; 340 NW2d 651 (1983), noted, "[T]he Supreme Court has never required the trial courts to make this determination on the record, even though at least one panel of this Court has suggested that it should." *Id.* at 448, citing *People v Nabers*, 103 Mich App 354, 362; 303 NW2d 205 (1981), rev'd in part on other grounds 411 Mich 1046 (1981). Furthermore, when the trial court decided that it would admit the evidence at trial it also committed to instruct the jury in a way that would cushion the prejudicial effect of the evidence, as the Supreme Court suggested in *VanderVliet*. At the close of the trial, the trial court followed through with its intention by issuing a limiting instruction relevant to this other acts evidence. The instruction cautioned the jury not to infer that defendant had a bad character and acted in accordance with that bad character in order to find that he committed the charged offenses. This protected defendant's right to a fair trial.

The trial court, however, plainly failed to apply the correct test in examining whether evidence of the Slauson Middle School robbery should be admitted at trial. To the extent that it may have considered the proper factors in making its decision, the trial court

failed to give us any indication of what it considered other than the "similarity" of the crimes when it ruled this other acts evidence admissible. However, because the trial court reached the correct result, it did not commit an error requiring reversal in admitting the evidence. *People v Chavies*, 234 Mich App 274, 284; 593 NW2d 655 (1999).

### (2) CLARION HOTEL EVIDENCE

As with the question whether the trial court properly admitted the evidence of the offense at the Slåuson Middle School, our analysis of whether it properly admitted the evidence of the Clarion Hotel robbery would be much easier if the trial court had placed its reasoning on the record. Again, the sum and substance of the trial court's reasoning was that evidence of the Clarion Hotel robbery was admissible because it was similar to the charged offenses. Unlike our analysis above, we find it difficult to conclude that the trial court's decision to admit the evidence of this prior bad act was correct.

We encounter our first obstacle to affirming the trial court's decision to admit this evidence when examining whether there was "substantial evidence" that defendant committed the robbery at the Clarion Hotel. We are mindful that the prosecutor did not need to prove that defendant committed the robbery beyond a reasonable doubt, *Golochowicz, supra* at 309, n 6, but there is very little evidence that ties defendant to the hotel robbery. Although defendant's wife told the police that he was not at home at the time of the robbery, White, the hotel employee on duty at the time of the robbery, never identified the man who robbed her, much less stated that it was

defendant. We are not aware of any physical evidence tying defendant to the hotel crime. Nor did anyone report seeing a dented white car around the Clarion Hotel at the time of the robbery.

While there is some similarity between the description of the assailant who committed the charged offenses and the hotel robbery, the similarities are very general. For example, there are likely a very large number of men who are approximately 5'6" tall, many of them African-Americans like defendant. More importantly, Doe said that her assailant was wearing a sweatshirt with a hood and covered his face with a navy blue bandanna, but White said that the man who robbed her was wearing a black jacket with the word "Spurs" written across it and he was wearing a scarf over his face. White's attacker was not wearing a hood according to her trial testimony. This was not the same clothing being described within a reasonable margin of error, i.e., the differences in each victim's description of her assailant's clothing cannot be attributed merely to different vocabulary used to describe the same items of clothing. A reasonable person could not infer solely on the basis of vague similarities between the clothing each perpetrator wore that the same man committed both the Clarion Hotel robbery and the charged offenses.[6]

---

[6] Above, we concluded that there was sufficient evidence to establish that defendant committed the robbery at the Slauson Middle School even though Miller's description of what her attacker was wearing did not match Doe's description of her attacker's clothing. However, Miller's firm identification of defendant as her attacker made any difference in clothing irrelevant to whether we can be certain that defendant committed both crimes. Because White did not identify defendant as her attacker, her description of the Clarion Hotel robber's appearance, including his clothing, is somewhat more important in determining if the same person committed the hotel robbery and the charged offenses.

Further, while Doe was able to describe the pistol her assailant used because of its unique appearance, a silver body with bronze or gold on the sides, White only described the pistol the robber used as small and a color that was silver or chrome. White did not mention any contrasting color on the pistol, much less that it was partly covered with gold or bronze. There is nothing unique about a small silver pistol that would tend to identify[7] defendant as the Clarion Hotel robber. There are many pistols that fit this general description. See, e.g., *People v Mateo*, 453 Mich 203, 232; 551 NW2d 891 (1996); *Nabers, supra* at 362; *People v Gibson*, 66 Mich App 531, 537; 239 NW2d 414 (1976). Even though the police found cash in defendant's home, including a $100 bill and a roll of quarters, the money in defendant's home was not the exact amount of money taken from the Clarion Hotel, there was no evidence that it was identified as property of the Clarion Hotel in any way, and this currency is in wide circulation. In sum, the evidence that defendant committed the Clarion Hotel robbery is so minimal that, even when we draw all reasonable inferences, there is little question that it falls below what might be considered "substantial" evidence.

The second part of the *Golochowicz* test is relevant to the heart of the prosecutor's theory for the admissibility of this evidence. Remember, the prosecutor

---

[7] When analyzing the Slauson Middle School offense we commented on the similar way the assailants *used* a small silver weapon to perpetrate that offense and the charged offenses. We did not conclude that the presence of a small silver weapon at each crime was sufficient to establish that defendant committed both crimes. Rather, we relied primarily on eyewitness identifications. As a result, our conclusion here that the small silver pistol was insufficient to establish that defendant committed the Clarion Hotel robbery does not conflict with our analysis of the Slauson Middle School evidence.

asked the trial court to admit this evidence because it tended to prove identity through modus operandi, i.e., the *way* the person committed both offenses was so distinctive it revealed who he was. However, there are far more differences than similarities between the Clarion Hotel robbery and the charged offenses. While the victims of both crimes were women, roughly half the population are women. Although both crimes occurred in the morning, the hotel robbery occurred in the very early morning hours, around 4:00 A.M., but the attack and robbery at Bursley Hall occurred at the start of the work day, around 8:00 A.M. Quite significantly, the charged offenses started outside, moved into the victim's car, and involved a sexual assault. The Clarion Hotel robbery occurred in a building, the perpetrator did not attempt to force White to leave with him or get into a car, and it did not involve a sexual assault. The attacker at Bursley Hall used actual force against his victim, while the hotel robber merely displayed his weapon. There was no evidence that the person who robbed White had been watching the Clarion Hotel to determine an optimal time to commit his offense, while Doe said that she had seen her attacker waiting at the bus stop, ostensibly waiting to attack her. To paraphrase the Supreme Court in *People v Lee*, 434 Mich 59, 94-95; 450 NW2d 883 (1990), there was nothing unique about the serious but rather ordinary robbery at the Clarion Hotel. Without further explanation from the trial court that would reveal what similarities it saw between these two crimes, we disagree that they were committed in a sufficiently similar manner to suggest that the same man committed both offenses.

The third and fourth parts of the *Golochowicz* test that deal with logical relevancy and prejudice lend significantly less support to the trial court's decision to admit this evidence at trial. With such little evidence that defendant committed the Clarion Hotel robbery and that he committed that robbery in the same way he committed the charged offenses, we see no tendency for testimony concerning the Clarion Hotel robbery to prove that defendant was the perpetrator in this case. MRE 401. With such little relevance, the prejudice from this evidence substantially outweighed its value, meriting exclusion under MRE 403. The trial court abused its discretion in admitting this evidence.

Nevertheless, a trial court's error of this sort "is not a ground for reversal unless 'after an examination of the entire cause, it shall affirmatively appear' that it is more probable than not that the error was outcome determinative." *People v Lukity*, 460 Mich 484, 495-496; 596 NW2d 607 (1999), quoting MCL 769.26; MSA 28.1096. Under this test, the trial court's error in admitting this evidence was harmless. There was a significant amount of other evidence that established that defendant committed the charged offenses, including Doe's testimony. That she did not accurately identify defendant during the police investigation certainly sheds some doubt on her credibility. However, it was the jury's province to determine whether her later identification was accurate. See, generally, *People v Lemmon*, 456 Mich 625, 642-644; 576 NW2d 129 (1998).

There also was a substantial amount of other evidence that legitimately bolstered Doe's credibility and helped establish that defendant committed the

charged offenses. For instance, three Bursley Hall employees described seeing an African-American man near the scene of the crime wearing the same clothes defendant was wearing. Two of the three employees saw this man in or near a battered white car at that time and one of the three employees stated that she was very certain that defendant was that man. The police, using information defendant's wife provided, found a pistol that matched the description Doe gave of the pistol her attacker used. The police found ammunition in defendant's home that fit the pistol they located, as well as clothing matching Doe's description of what her assailant was wearing when he attacked her. The police eventually found a bandanna in Wendy Smith's purse like the one Doe said defendant was wearing at the time of the offenses. Added together, these factors make it more probable than not that this error was harmless rather than outcome determinative. Therefore, defendant is not entitled to relief on this basis.[8]

### III. HEARSAY

#### A. PRESERVATION OF THE ISSUE AND STANDARD OF REVIEW

Defendant next argues that the trial court erred in relying on the "catch-all" hearsay exception in MRE 804(b)(6) to admit statements his wife made to the police and a neighbor because the statements were inherently unreliable and violated his Sixth Amendment right to confront witnesses testifying against him. He preserved this constitutional issue for appeal

---

[8] Note that, even if the trial court erroneously admitted the evidence concerning the offense at the Slauson Middle School, these same factors would make such an error harmless.

by raising it in the lower court. See *People v Hogan*, 225 Mich App 431, 438; 571 NW2d 737 (1997). Because defendant's argument implicates his Sixth Amendment right to confront his accuser, we apply review de novo. See *People v Beasley*, 239 Mich App 548, 553; 609 NW2d 581 (2000); see, generally, *Lilly v Virginia*, 527 US 116, 118; 119 S Ct 1887; 144 L Ed 2d 117 (1999).

### B. PRIVILEGE

Because of some confusion in the terminology that applies to this issue, we pause to note the difference between a spousal privilege and a marital privilege, as the Legislature established in MCL 600.2162; MSA 27A.2162. The Supreme Court, in *People v Hamacher*, 432 Mich 157, 161-162; 438 NW2d 43 (1989), succinctly outlined the difference between these privileges:

Section 2162 of the RJA provides two distinct privileges. The first, the spousal privilege, is only applicable when the witness and the spouse are married at the time of trial. This privilege bars one spouse from testifying for or against the other without the other's consent except in (1) actions for divorce, (2) prosecutions for bigamy or for a crime committed against the children of either or both, (3) actions growing out of a personal wrong or injury done by one to the other or the refusal or neglect to furnish the spouse or children with suitable support, (4) cases of desertion or abandonment, and (5) certain cases relating to marriage and title to property.

The second privilege, the [marital] communication privilege, bars one spouse from testifying "as to any communications made by one to the other during the marriage" without the consent of the other. The communication privilege applies whether the testimony is sought "during the marriage or afterwards," as long as the communication occurred during the marriage. Section 2162 of the RJA states

> no exceptions with respect to the communication privilege. [Emphasis deleted.]

It is apparent from the description of the challenged hearsay testimony, below, that defendant invoked both the spousal privilege and the marital privilege in this case. Invoking the spousal privilege was his right under this statute because he and his wife were married at the time of the trial and, therefore, the privilege barred her testimony regardless of its substance. Although largely subsumed by the spousal privilege in this case, the marital privilege was the privilege that actually applied to evidence concerning defendant's *communication* with his wife.

### C. THE CHALLENGED TESTIMONY

At the outset of the preliminary examination, defense counsel informed the trial court that he believed that the prosecutor intended to call Wendy Smith to testify against her husband, defendant. Defense counsel objected to this prospect and asserted that defendant's "marital privilege" prevented Wendy Smith from testifying, noting that defendant and Wendy Smith were married at the time of the alleged offenses and they continued to be married. The prosecutor responded that there was "no doubt" that the privilege applied and, therefore, did not oppose the motion to prevent Wendy Smith from testifying. The trial court agreed, effectively precluding the prosecutor from calling Wendy Smith to testify during any of the proceedings in the case.

Nevertheless, the prosecutor then asked the trial court to admit statements Wendy Smith made to the Ann Arbor Police during the investigation of these

offenses pursuant to MRE 804(b)(6), which provides a hearsay exception for

· [a] statement not specifically covered by any of the foregoing [hearsay] exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact, (B) the statement is more probative on the point for which it is offered than any other evidence that the proponent can procure through reasonable efforts, and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of the statement makes known to the adverse party, sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

The prosecutor had, indeed, followed this notice procedure. In the first notice, which was filed before the preliminary examination, the prosecutor identified the evidence that was arguably admissible under this hearsay exception. The prosecutor intended to introduce Wendy Smith's statement to the police that she heard defendant say "I have to get rid of this gun" before he threw a pistol out the window of their car as they were traveling down Victors Way. In this instance, the marital privilege kept Wendy Smith from repeating defendant's statement concerning the pistol and the spousal privilege would have prevented her from describing any other circumstances relevant to the charged offenses, including how she later took the police to the area where they found the pistol and told the police that defendant left their home shortly before the Slauson Middle School and Clarion Hotel

robberies occurred. During the preliminary examination, the prosecutor also asked the trial court to admit evidence that, while defendant was in jail, Wendy Smith solicited her friend, Crystal Smith, to make a false report to suggest that defendant was not the true assailant. This, again, was covered by the spousal privilege.

The prosecutor contended that, because defendant was asserting these privileges, Wendy Smith was unavailable according to *People v Whalen*, 129 Mich App 732, 737-738; 342 NW2d 917 (1983). The prosecutor pointed out that these statements to the police were material to proving defendant had a pistol and was not at home during the charged offenses. Additionally, Wendy Smith's decision to ask Crystal Smith to file a false report, allegedly at defendant's request, was material to proving defendant was conscious of his own guilt. The prosecutor briefly contended that the hearsay statements were the most probative evidence available because Wendy Smith could not be called to testify and that justice would be served by admitting them into evidence. Further, the prosecutor pointed out that there were several factors that made this testimony credible. First, the police found the pistol at the place Wendy Smith described, and found compatible bullets in the Smiths' house. Second, a wife is not naturally inclined to lie to inculpate her husband, and Wendy Smith had recanted her earlier testimony that had not inculpated her husband. Third, Crystal Smith could corroborate Wendy Smith's statements to her. Fourth, the attempt to solicit Crystal Smith resulted in a statement against Wendy Smith's penal interest, making it reliable.

Defense counsel objected to the admission of the statements Wendy Smith made to the police because she made them while in police custody, she was under arrest for robbery at the time, and she was under pressure to incriminate defendant in order to exculpate herself. Furthermore, Wendy Smith changed her testimony because, defense counsel suggested, she was afraid of being separated from her children.

The trial court ruled:

> All right. Mr. Isley [defense counsel], I understand your argument with regard to why you—I understand why you're arguing that the two statements would indicate, would be an indication of unreliability. However, under the circumstances where one of the statements is clearly corroborated and two of the others are in the "may have" as opposed to "was" situation—she's not saying that he actually was gone or was in a particular area at a particular time, but that he may have not been at home during that time. And with regard to the statement relative to the time the Clarion robbery occurred, which was the day before the arrest was made in this case, roughly 24 hours before the arrest was made, certainly should have a reason to remember that time period very clearly. I am going to rule—first of all, your client is asserting the marital privilege [sic]; the declarant is unavailable for testimonial purposes. The Court is satisfied that there is sufficient indicia of reliability and the Court will admit the statements.

The prosecutor filed a supplemental notice explaining in additional detail which of Wendy Smith's hearsay statements should be introduced at trial. Defendant again objected to the admission of these statements. At a pretrial motion hearing in September 1997, defense counsel argued that not only were the

statements unreliable for the same reasons previously articulated, but that

> if we allow this testimony, the testimony of the police officer is in fact the words of this gentleman's spouse, and we would effectively be repealing the spousal privilege statute in any case where there had been a statement of the spouse made to the police. It would appear to me that this would not be appropriate or proper.

The trial court overruled the objection, reasoning:

> All right. The issue presents an interesting question which, I presume, since nobody's presented me with any law that particularly applies, because that's a new hearsay exception. My inclination, though, is to agree with the prosecutor at this point that the purpose for the privilege was to preclude the spouse having to stand before the Court or the jury and testify in a way that would be contrary to what his or her spouse might think was the appropriate thing—or contrary to their interest, thereby putting the spouse in a sort of compromising position, having to theoretically go home with the person that she or he just testified against.
>
> The purpose for which the prosecutor seeks to use the statements would not require the spouse to do that, but basically is a way which, as Mr. Barnett [defense counsel] admits, it would appear that the rule was employed properly but for the objection which is that it essentially will eliminate the spousal immunity rule.
>
> So I'm going to overrule your objections at this time, without prejudice. If, between now and the trial, you find some other law, I will look at it again. If you find something that suggests that I am wrong, I will certainly look at it again and would not hesitate to change my mind.

This question of the effect admitting hearsay testimony has on either the spousal or marital privilege is an interesting one. However, defendant limited his issue on appeal to whether his wife's hearsay state-

ments were sufficiently trustworthy to satisfy the Sixth Amendment.

### D. MRE 804(B)(6) AND THE CONFRONTATION CLAUSE

To be admissible under the MRE 804(b)(6) "catch-all" hearsay exception, a statement must qualify under the rules of evidence and the admission of the statement must be consistent with the rights embodied in the Confrontation Clause of the Sixth Amendment. See *Idaho v Wright*, 497 US 805, 814; 110 S Ct 3139; 111 L Ed 2d 638 (1990). Thus, a hearsay statement admitted under MRE 804(b)(6) must show a " 'particularized guarantee[] of trustworthiness' " before a trial court may allow a party to introduce the evidence. *Wright, supra* at 815 (citation omitted). Without such a finding, the statements are " 'presumptively unreliable' " and unconstitutional. *Id.* at 818 (citation omitted). A court must determine whether such statements are trustworthy and reliable after considering "the totality of the circumstances." *Id.* at 819. However, "the relevant circumstances include only those that surround the making of the statement and that render the declarant particularly worthy of belief." *Id.*; see also *United States v Accetturo*, 966 F2d 631, 635-636 (CA 11, 1992). Corroborating evidence cannot justify admitting an otherwise untrustworthy statement. *Wright, supra* at 823.

While we do not view Wendy Smith's statements to the police while in custody as at all involuntary, we do think that they lack evidence of sufficient trustworthiness. As defense counsel pointed out in the trial court, Wendy Smith made the statements to the police concerning defendant's whereabouts during the other offenses only after she had been accused of

committing a crime. She had good reason to tell the police something that would incriminate her husband to avoid being prosecuted herself.[9] In fact, she changed her initial statement to the police concerning where defendant was during these other crimes in a way that tended to incriminate defendant. A reasonable inference is that she made this change to obtain favorable treatment from the police and prosecutors handling her case, casting some doubt on its trustworthiness. As for the alleged statement Wendy Smith made to Crystal Smith concerning filing a false police report, the prosecutor relied solely on Crystal Smith's ability to corroborate this statement to show that it was trustworthy. Similarly, the prosecutor relied on the fact that the police had recovered the pistol Wendy Smith said defendant had thrown out of the car along Victors Way and had discovered the matching bullets in the Smiths' home to justify her statement that defendant had said he had to "get rid" of a gun. *Wright, supra* at 823, forbids this sort of "bootstrapping" by corroboration, i.e., attempting to show that a statement is trustworthy not by relying on evidence of the circumstances surrounding when the declarant made the statement, but by showing that the statement was proved true at a different time or place. As a result, we agree with defendant that the

---

[9]   The record indicates that the police had arrested Wendy Smith for a crime and that she had been informed that she was a "suspect" at the time she made her two statements. While defense counsel's remarks suggest that the police arrested Wendy Smith for robbery, the record does not reveal the specific nature of the crime the police believed that she had committed.

trial court erred in concluding that the statements were trustworthy.[10]

Nevertheless, as we pointed out while analyzing whether the evidence concerning the Clarion Hotel robbery was admissible, not every error requires reversing a criminal conviction. Because this is a preserved, constitutional issue, we must determine whether the prosecutor established that this error was harmless beyond a reasonable doubt. *People v Carines*, 460 Mich 750, 774; 597 NW2d 130 (1999). We would repeat ourselves unnecessarily to outline all the evidence the prosecutor introduced that supported the convictions in this case that had absolutely nothing to do with Wendy Smith's statements to the police or Crystal Smith. For the reasons we found the trial court's decision to admit the evidence concerning the Clarion Hotel robbery harmless, we also find this error harmless.

### IV. JURY INSTRUCTIONS

Defendant's final argument is that the trial court failed to instruct the jury adequately with regard to the proper use of similar acts evidence. He did not object to the instructions as given or request an additional limiting instruction. Thus, he failed to preserve this issue for appeal. *People v Puroll*, 195 Mich App 170, 171; 489 NW2d 159 (1992). Only plain error affecting defendant's substantial rights would support reversing his convictions in this instance. *Carines*, *supra* at 763-764. Defendant has failed to provide any

---

[10] We do not address whether the evidence would pass the other two parts of the test set out in MRE 804(b)(6) because defendant does not challenge them here.

authority or argument demonstrating that the trial court had a duty to issue this sort of additional limiting instruction during the trial without a specific request. Furthermore, the trial court did give a limiting instruction, albeit at the end of the trial, that protected defendant's rights by precluding the jury from considering the evidence of these other uncharged acts for an improper purpose. Consequently, we do not see an error in this case, much less a plain error that affected defendant's substantial rights.

Affirmed.