# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

ORLANDO BROWN,

        Defendant-Appellant.

UNPUBLISHED
December 12, 2017

No. 333927
Wayne Circuit Court
LC No. 15-006491-04-FC

---

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

LAVELLE ANTONIO FIELDS,

        Defendant-Appellant.

No. 333931
Wayne Circuit Court
LC No. 15-006491-02-FC

---

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

TJUAN AQUIS MCCLOUD,

        Defendant-Appellant.

No. 333932
Wayne Circuit Court
LC No. 15-006491-03-FC

---

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

ANTONIO DONTEZ WEBSTER,

        Defendant-Appellant.

No. 333933
Wayne Circuit Court
LC No. 15-006491-01-FC

---

Before: TALBOT, C.J., and BORRELLO and RIORDAN, JJ.

PER CURIAM.

Defendants Orlando Brown, Lavelle Antonio Fields, Tjuan Aquis McCloud, and Antonio Dontez Webster were convicted by a jury of felony murder,[1] second-degree murder,[2] and armed robbery.[3] Defendants' second-degree murder convictions were vacated, and each defendant was sentenced to life in prison without parole for his felony-murder conviction and a term of imprisonment of varying length for his armed-robbery conviction. Defendants appeal as of right.[4] We affirm, but remand this matter to the trial court in Docket No. 333927 for the ministerial task of correcting Brown's sentencing information report (SIR).

I. BACKGROUND

This case arises from the April 19, 2015 robbery and murder of Henry Perry. The bulk of the narrative concerning the events surrounding Perry's death was provided by a fifth accomplice, Ashley Thompson, who was dating Fields in April 2015 and maintained a platonic relationship with Perry. At trial, Thompson testified that Fields and Webster devised a plan to rob Perry after Fields learned of her secret friendship with Perry on April 18, 2015. On April 19, Fields and Webster included McCloud in discussions concerning the planned robbery and Fields indicated that Perry "had to go," which Thompson construed as meaning Perry had to die.

Around 3:30 p.m. on April 19, Thompson lured Perry to the intersection of Longacre and Wadsworth in Detroit by turning the engine of her Jeep off, activating her hazard lights, and calling Perry to ask for help with her malfunctioning vehicle. While Perry was examining the Jeep's engine compartment, Webster and McCloud arrived in a burgundy Impala driven by Brown. According to Thompson, Webster pointed a gun at Perry and told him not to move. As she was driving away from the standoff, she heard two gunshots and observed that Perry was not standing anymore. In her rearview mirror, she saw McCloud take Perry's shorts off before getting inside Perry's truck. A few minutes later, Fields called and directed her to pick McCloud up at an intersection approximately two streets from the scene. Thompson complied and, after locating McCloud, observed him removing a cell phone and wallet from Perry's shorts.

Thompson returned to her house on Meyers Street with McCloud, where she saw Brown and Fields in the Impala, parked in her driveway. Once inside the house, Fields, Brown, and McCloud split Perry's money, Fields took Perry's cell phone, and they agreed to dispose of the

---

[1] MCL 750.316(1)(b).

[2] MCL 750.317.

[3] MCL 750.529.

[4] Defendants' appeals were consolidated to advance efficient administration of the appellate process. *People v Brown*, unpublished order of the Court of Appeals, entered July 27, 2016 (Docket Nos. 333927, 333931, 333932, 333933).

Impala. About 30 minutes later, they left the house—Brown and McCloud in the Impala and Thompson and Fields in her Jeep. Fields directed her to the eastside of Detroit, where Brown, McCloud, and Webster were waiting. Shortly after abandoning the Impala, Thompson and defendants were pulled over due to improper license plates on Thompson's Jeep. McCloud was arrested on an outstanding warrant, but Thompson, Fields, Brown, and Webster were permitted to leave without incident. When McCloud was searched at the Detroit Detention Center, Perry's identification and credit card were discovered in his pant leg.

In the early morning hours of April 20, 2015, Thompson, Fields, and Webster drove to the house Webster shared with his girlfriend, Dionne Williams-Mitchell. Williams-Mitchell testified that Thompson, Fields, and Webster discussed the April 19 robbery and murder. Williams-Mitchell also testified that Brown drove a red or burgundy Impala for a period of time in April 2015, which Webster had stolen from a woman he met at the liquor store.

The prosecution also presented cell phone records tending to implicate defendants in Perry's death. Testifying as an expert in forensic analysis of cell phone call detail records, Stan Brue presented a chart depicting the phone calls between the four defendants and Thompson between 3:40 p.m. and 4:00 p.m., i.e., the period shortly before and after the 3:52 p.m. 911 call reporting the shooting, along with a map depicting the cellular sites and sectors utilized for most of the calls. According to Brue, the sites and sectors used in the periods before and after the shooting were consistent with use at or near the crime scene. Detective David Boike, an expert in computer and cell phone forensics, extracted potentially incriminating data from cell phones belonging to Fields, Webster, and McCloud. Between April 19 and April 22, 2015, Webster's cell phone contained internet search queries regarding Detroit crimes and how to remove OnStar from a 2007 Impala. There were also a number of visits to local news websites with headings including, "a man shot and killed on Detroit's west side," "fatal shooting," and "police search for trio suspect after fatal shooting and robbery." Fields's cell phone reflected a similar internet search history concerning recent shootings in Detroit.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Brown and Fields argue that they were denied the effective assistance of counsel when their respective trial attorneys failed to request separate trials or juries. To preserve a claim of ineffective assistance of counsel, a defendant must move for a new trial or seek a *Ginther*[5] hearing in the trial court.[6] Neither Brown nor Fields moved for a new trial or *Ginther* hearing below, and Brown's motion to remand for that purpose was denied by this Court.[7] As such, this issue is unpreserved. Ineffective assistance of counsel claims present a mixed question of fact and constitutional law.[8] The lower court's findings of fact are generally reviewed for clear error,

---

[5] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[6] *People v Davis*, 250 Mich App 357, 368; 649 NW2d 94 (2002).

[7] *People v Brown*, unpublished order of the Court of Appeals, entered May 2, 2017 (Docket No. 333927).

[8] *People v Jordan*, 275 Mich App 659, 667; 739 NW2d 706 (2007).

while its rulings on questions of constitutional law are reviewed de novo.[9] Because this issue is unpreserved, our review is limited to errors apparent from the record.[10]

To establish a claim of ineffective assistance of counsel, "a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different."[11] "A reasonable probability is a probability sufficient to undermine confidence in the outcome."[12] This Court presumes that defense counsel rendered effective assistance and exercised reasonable professional judgment in all significant decisions.[13] Accordingly, the defendant must "overcome the strong presumption that counsel's performance was born from a sound trial strategy."[14]

Criminal defendants charged with the same offense do not have an absolute right to separate trials.[15] To the contrary, "[a] strong policy favors joint trials in the interest of justice, judicial economy, and administration."[16] However, MCR 6.121(C) provides that "[o]n a defendant's motion, the court must sever the trial of codefendants on related offenses on a showing that severance is necessary to avoid prejudice to substantial rights of the defendant." When a defendant challenges a joint trial on the basis of antagonistic defenses,

> [i]nconsistency of defenses is not enough to mandate severance; rather, the defenses must be "mutually exclusive" or "irreconcilable." Moreover, "[i]ncidental spillover prejudice, which is almost inevitable in a multi-defendant trial, does not suffice." The "tension between defenses must be so great that a jury would have to believe one defendant at the expense of the other."[17]

Unless there is a "significant indication on appeal that the requisite prejudice in fact occurred at trial," a defendant's failure to satisfy the requirements of MCR 6.121(C) precludes reversal of a

---

[9] *Id.*

[10] *Id.*

[11] *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012).

[12] *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001), quoting *Strickland v Washington*, 466 US 668, 694; 104 S Ct 2052; 80 L Ed 2d 674 (1984).

[13] *People v Vaughn*, 491 Mich 642, 670; 821 NW2d 288 (2012).

[14] *Trakhtenberg*, 493 Mich at 52.

[15] *People v Bosca*, 310 Mich App 1, 44; 871 NW2d 307 (2015).

[16] *Id.*, quoting *People v Harris*, 201 Mich App 147, 152; 505 NW2d 889 (1993).

[17] *People v Hana*, 447 Mich 325, 349; 524 NW2d 682 (1994) (citations omitted) (second alteration in original).

joinder decision.[18]  Additionally, because use of separate juries is a partial form of severance, issues involving separate juries are evaluated under the same standard.[19]

In Docket No. 333927, Brown contends that his defense was mutually exclusive because there were four defendants on trial for crimes committed by three people.  We disagree.  Brown's position lacks merit because it ignores the fact that he and his codefendants were prosecuted under an aiding and abetting theory.  "Fingerpointing by the defendants when such a prosecution theory is pursued does not create mutually exclusive antagonistic defenses."[20]  Brown's odd-man-out theory is particularly unpersuasive in light of Thompson's testimony identifying Brown as the driver of the getaway car and evidence that the fourth defendant, Fields, planned and coordinated the crimes, even if he was not present at the time the plan was executed.  Thus, it was not objectively unreasonable for Brown's attorney to refrain from seeking a separate trial or jury when Brown was not entitled to severance.

In Docket No. 333931, Fields argues that he was prejudiced by the joint trial because Webster, McCloud, and Brown repeatedly targeted him as the person responsible for the robbery and murder.  According to Fields, there was no strategic reason for his attorney to place him in the position of having to defend against allegations from the prosecution and his codefendants.  We disagree.  It is to be expected that the attorneys representing codefendants in a joint trial will attempt to present the evidence in the light most favorable to his or her respective client.[21]  But, again, when multiple defendants are prosecuted under an aiding and abetting theory, attempts to shift the blame to codefendants do not result in mutually exclusive or antagonistic defenses that require severance.[22]  Accordingly, Fields cannot demonstrate that his attorney was ineffective for failing to request separate trials or juries.

### III.  JURY INSTRUCTIONS

In Docket Nos. 333927, 333931, and 333933, Brown, Fields, and Webster, argue that the trial court erred by instructing the jury regarding flight as evidence of consciousness of guilt.  "Claims of instructional error are generally reviewed de novo by this Court, but the trial court's determination that a jury instruction is applicable to the facts of the case is reviewed for an abuse of discretion."[23]  "A defendant has the right to have a properly instructed jury consider the evidence against him or her, and it is the trial court's role 'to clearly present the case to the jury

---

[18] *Id*. at 346-347.

[19] *Id*. at 351.

[20] *Id*. at 360-361.

[21] *Id*. at 348.

[22] *Id*. at 360-361.

[23] *People v Henderson*, 306 Mich App 1, 3; 854 NW2d 234 (2014), quoting *People v Dobek*, 274 Mich App 58, 82; 732 NW2d 546 (2007).

and to instruct it on the applicable law.' "[24] Before releasing the jury to deliberate, the trial court's final instructions to the jury including the following, modeled after M Crim JI 4.4:

> There has been some evidence in this case that the defendants ran away after the alleged crimes. This evidence does not prove guilt. A person may run or hide for innocent reasons such as panic, mistake, or fear. However, a person may also run or hide because of a consciousness of guilt. When you deliberate you must decide whether the evidence is true, and if true whether it shows that each defendant had a guilty state of mind.

On appeal, Brown, Fields, and Webster do not dispute the validity of the legal principal underlying the so-called flight instruction. Rather, they argue that the trial court erred by providing the flight instruction to the jury because it was unsupported by the evidence, which showed that the perpetrators left the scene after completing the shooting and robbery, but did nothing to intentionally avoid detection.

Defendants correctly observe that their interactions with the police in connection with this case—during the April 19 traffic stop and at the time of their respective arrests—were generally described as cooperative and that the prosecution did not present evidence to suggest that they fled the scene as a result of active pursuit. However, it does not follow, as defendants argue, that the jury could not infer that their departure evinced consciousness of guilt. In addition to Thompson's recollection of the April 19 robbery and murder, the prosecution also presented testimony from Floria Thomas, an unrelated third-party who witnessed the incident. According to Thomas, three African-American men were involved in the shooting and, after the perpetrators shot Perry and removed his shorts, two of the perpetrators sped away from the scene in the Impala, while the third perpetrator fled the scene on foot. Thompson likewise indicated that McCloud was left behind and that she had to return to the area to pick him up. The jury could infer from the hasty retreat of those defendants who departed in the Impala, and their refusal to return when it became apparent that McCloud was left without a quick avenue of escape, that defendants left the scene in order to elude detection, and not simply because they had completed their mission. Thus, the trial court did not abuse its discretion by properly instructing the jury that it should determine whether the circumstances of defendants' departure were indicative of a guilty state of mind.[25]

Having addressed those claims raised by more than one defendant, we will now turn to the balance of the issues raised by each defendant.[26]

---

[24] *Henderson*, 306 Mich App at 4, quoting *Dobek*, 274 Mich App at 82.

[25] *People v Unger*, 278 Mich App 210, 226; 749 NW2d 272 (2008) ("[I]t is always for the jury to determine whether evidence of flight occurred under such circumstances as to indicate guilt.")

[26] Fields did not raise any additional issues in Docket No. 333931.

## IV.  DOCKET NO. 333927 – ORLANDO BROWN

### A.  GREAT WEIGHT OF THE EVIDENCE

To preserve a claim that a jury's verdict was against the great weight of the evidence, the party claiming such error must move for a new trial on that ground.[27]  Brown did not move for a new trial on this basis below and his motion to remand for that purpose was denied by this Court.[28]  As such, this issue is unpreserved, and our review is limited to plain error affecting Brown's substantial rights.[29]  "The test to determine whether a verdict is against the great weight of the evidence is whether the evidence preponderates so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand."[30]  "Conflicting testimony and questions of witness credibility are generally insufficient grounds for granting a new trial."[31]  The jury's verdict should not be disturbed "[u]nless it can be said that directly contradictory testimony was so far impeached that it 'was deprived of all probative value or that the jury could not believe it,' or contradicted indisputable physical facts or defied physical realities . . . ."[32]

In arguing that the jury's verdict was against the great weight of the evidence, Brown first takes issue with Thompsons's testimony concerning Brown's role in the incident, arguing that as Fields's girlfriend, she had motive to identify Brown as the driver instead of Fields. Additionally, he maintains that Thompson's identification was directly contradicted by Thomas's description of the driver.  Brown's arguments lack merit because neither issues of witness credibility nor conflicting evidence will generally suffice to demonstrate that a defendant's conviction was contrary to the great weight of the evidence.[33]  The jury was well aware that Thompson's relationship with Fields might sway her testimony and still accepted her assertion regarding Brown's involvement as true.  Admittedly, Thomas described the driver as having a stocky build and dreadlocks and agreed at trial that Fields was stocky and had dreadlocks. However, Brown's physical appearance in April 2015 is not apparent from the record provided to this Court[34] and, thus, does not support his claim of error.

---

[27] *People v Musser*, 259 Mich App 215, 218; 673 NW2d 800 (2004).

[28] *People v Brown*, unpublished order of the Court of Appeals, entered May 2, 2017 (Docket No. 333927).

[29] *Musser*, 259 Mich App at 218.

[30] *Id*. at 218-219.

[31] *Unger*, 278 Mich App at 232.

[32] *Musser*, 259 Mich App at 219, quoting *People v Lemmon*, 456 Mich 625, 645-646; 576 NW2d 129 (1998).

[33] *Unger*, 278 Mich App 232.

[34] Thomas confirmed that Brown had a braided hairstyle *at trial* and did not opine regarding his body type.  Thompson was uncertain regarding Brown's hairstyle in April 2015, but indicated

Brown also points to cell phone records indicating that approximately 1 minute before the shooting was reported to 911 and approximately 3½ to 5 minutes after the 911 call, he was not in the vicinity of Longacre and Wadsworth. Specifically, a 3:51 p.m. call utilized what Brue described as the "grey sector," the far edge of which ends approximately one block south to south-east of the scene. Calls at 3:56 p.m. and 3:58 p.m. utilized what Brue referred to as the "yellow sector," the far edge of which ends approximately one to two blocks east of the scene. However, Brue made the limitations of the information available from call detail records abundantly clear: he could not definitively place a person in a particular location based on the records. Rather, he could only opine as to whether the cellular site used by a cell phone was consistent with being in a location. Furthermore, he explained that the geographic dimensions covered by each cellular site were not exact and that the maps he prepared depicting the relevant sites and sectors only showed the *intended* service area. Brue also identified numerous reasons why a cell phone might not connect to the intended or closest site, including factors like weather, topography, and signal quality or strength.

Importantly, Brue acknowledged that these records seemingly placed Brown away from the scene at the time of the shooting, but explained that in his experience, the actual dimensions covered by Sprint (Brown's service provider) cellular sites were often larger than the intended dimensions Sprint communicated to law enforcement personnel. Thus, he opined that even though Brown's phone connected to cellular sites that were not intended to service the crime scene, the close proximity of the utilized sites was still consistent with Brown being at the scene. Undoubtedly, the cell phone records presented a weakness in the prosecution's case against Brown, but Brue's interpretation of the records was not so seriously impeached that it was rendered completely unbelievable. Accordingly, we will not conclude that the evidence preponderated so heavily against the jury's verdict that it would be a miscarriage of justice to allow it to stand.

## B. SENTENCING ERROR

Brown also argues that his case should be remanded to the trial court for correction of his judgment of sentence and SIR. We agree, in part.

"Under the sentencing guidelines, the circuit court's factual determinations are reviewed for clear error and must be supported by a preponderance of the evidence."[35] Whether the statutory scoring conditions are satisfied by the trial court's findings of fact is a question of statutory interpretation and, therefore, reviewed de novo.[36]

---

that he might have had braids. She had difficulty recognizing him in a photograph in which he did not have a long hairstyle.

[35] *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013).

[36] *Id*.

Recognizing that the Double Jeopardy Clauses of the federal and state Constitutions prohibit multiple homicide convictions for the death of a single victim,[37] the trial court vacated Brown's conviction for second-degree murder before sentencing him for the felony-murder and armed-robbery convictions. As such, Brown correctly argues that the trial court erred by assessing 20 points for PRV 7, which is only proper when the defendant has two or more subsequent or concurrent convictions.[38] Because Brown had only one concurrent conviction— armed robbery—his score for PRV 7 should have been 10 points.[39]

Brown acknowledges on appeal that correction of this error will not alter the sentencing guidelines range applicable to his armed robbery conviction and does not seek resentencing. Instead, he requests that his case be remanded to the trial court only for "correction of his Judgment of Sentence and SIR." To the extent that Brown requests correction of his SIR, we agree that remand is appropriate for the ministerial task of amending Brown's PRV score. However, Brown's judgment of sentence accurately states that a jury found him guilty of second-degree murder, that the second-degree murder conviction was vacated, and that Brown's life sentence attached only to the felony-murder conviction.[40] As such, the judgment of sentence need not be amended on remand.

## V.  DOCKET NO. 333932 – TJUAN MCCLOUD

### A.  *BATSON*[41] ERROR

For his first claim of error, McCloud argues that he is entitled to a new trial because the prosecutor violated his right to equal protection by using peremptory challenges to remove potential African-American jurors. We disagree.

It is well settled that dismissal of a potential juror based solely upon his or her race violates the Equal Protection Clause of the Fourteenth Amendment.[42] When a defendant challenges the prosecution's dismissal of potential jurors as racially motivated, the trial court employs the three-part test developed in *Batson v Kentucky*: "First, the defendant must show a prima facie case of discrimination. Second, the prosecutor may rebut the defendant's prima facie

---

[37] *People v Clark*, 243 Mich App 424, 429; 622 NW2d 344 (2001).

[38] MCL 777.57(1)(a).

[39] MCL 777.57(1)(b).

[40] The trial court left the minimum and maximum terms of imprisonment applicable to count two, the second-degree murder count, blank on the judgment of sentence and added the following comment: "Defendant was found guilty of Felony Murder and Second[-]Degree Murder following jury trial. The convictions are merged for sentencing and the life sentence attaches to the Felony Murder only. . . . Count 2 is vacated."

[41] *Batson v Kentucky*, 476 US 79; 106 S Ct 1712; 90 L Ed 2d 69 (1986).

[42] *People v Knight*, 473 Mich 324, 335; 701 NW2d 715 (2005).

case with a race-neutral reason for dismissing the juror. Third, the trial court must determine whether the prosecutor's explanation is a pretext for discrimination."[43] Our consideration of purported *Batson* errors involves a mixed standard of review:

> If the first step is at issue (whether the opponent of the challenge has satisfied his burden of demonstrating a prima facie case of discrimination), we review the trial court's underlying factual findings for clear error, and we review questions of law de novo. If *Batson*'s second step is implicated (whether the proponent of the peremptory challenge articulates a race-neutral explanation as a matter of law), we review the proffered explanation de novo. Finally, if the third step is at issue (the trial court's determinations whether the race-neutral explanation is a pretext and whether the opponent of the challenge has proved purposeful discrimination), we review the trial court's ruling for clear error.[44]

To establish a prima facie case of discrimination under the first step, the party opposing the peremptory challenge must show three things:

> (1) he is a member of a cognizable racial group; (2) the proponent has exercised a peremptory challenge to exclude a member of a certain racial group from the jury pool; and (3) all the relevant circumstances raise an inference that the proponent of the challenge excluded the prospective juror on the basis of race.[45]

On the third day of jury selection, Brown's attorney objected to the prosecutor's use of a peremptory challenge to remove prospective juror KM. Counsel observed that KM was the fifth African American to be removed from the jury panel by the prosecutor and asserted that all five prospective jurors had been removed by virtue of their race. Although we note that the trial court failed to make factual findings regarding other circumstances from which racial discrimination could be inferred, the deficiency in the court's ruling is of no consequence to the issue at hand because a fair reading of the record demonstrates that the court ultimately ruled that the prosecutor did not engage in purposeful discrimination, thereby rendering the first *Batson* step moot.[46]

Of the eight individuals removed by the prosecutor, prospective jurors IP, JR, CR, KS, and KM were African American. Consistent with *Batson*'s second step, the prosecutor explained her reasons for dismissing each prospective juror. KM had giggled or laughed while answering questions concerning her father's criminal history and other matters during voir dire the previous day. KS had unwittingly conversed with Brown's brother outside of the courthouse. The

---

[43] *People v Armstrong*, 305 Mich App 230, 238; 851 NW2d 856 (2014), citing *Batson*, 476 US 96-98.

[44] *Knight*, 473 Mich at 345.

[45] *Id*. at 336.

[46] *Id*. at 338.

prosecutor did not believe IP would make an appropriate juror because her brother and father had both been convicted of drug trafficking offenses. JR, too, disclosed problems between her brother and the police and, given the demands upon JR's time as a student with dual employment, the prosecution was concerned that she might not be attentive throughout the lengthy trial. CR had a previous conviction for disorderly conduct. Additionally, the prosecutor had observed CR and JR behaving "extremely touchy, feely," in the courtroom. Thus, she was concerned that the two women may have developed some sort of relationship which could influence them to vote together or discuss the case outside of jury deliberations.

The reasons offered by the prosecution under the second step need not be persuasive or plausible.[47] Instead, the explanation must merely be based on something apart from race and, "[u]nless a discriminatory intent is inherent in the prosecution's explanation, the reason offered will be deemed race neutral."[48] Here, although defense counsel began rebutting the prosecutor's proffered explanations before the court ruled regarding *Batson*'s second step, it is evident that the prosecutor's reasons did not involve race and were not inherently discriminatory.

The final step under *Batson* requires the trial court to "determine whether the race-neutral explanation is a pretext and whether the opponent of the challenge has proved purposeful discrimination."[49] In the trial court, defense counsel took issue with the prosecutor's explanation for removing KM, arguing that it made little sense for the prosecutor—who had a large number of challenges remaining at all relevant times—to remove a prospective juror based on conduct that occurred the day before and had not been repeated. The prosecutor, on the other hand, maintained that she was following the defense attorneys' practice of exercising only one challenge at a time. Despite acknowledging that defense counsel "made a good point," the court concluded that it was satisfied with the prosecutor's nondiscriminatory explanations. While the court did not articulate specific findings or otherwise explain its rationale for accepting the prosecutor's explanations, a fair reading of the record suggests that the court determined that the proffered explanations were not pretextual and that defendants had not proved purposeful discrimination.

On appeal, McCloud simply concludes that the prosecutor's explanations were not clear, specific, legitimate, or related to the case being tried. These vague, generic criticisms do not elucidate why the prosecutor's proffered explanations were deficient or why McCloud contends that the trial court erred by concluding that the prosecutor had not engaged in purposeful discrimination. As such, this issue is abandoned because "[a]n appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims . . . ."[50] Moreover, even if this issue had been properly presented, the prosecutor's explanations were supported by the record and, having reviewed the voir dire transcripts, we see

---

[47] *Id*. at 337.

[48] *Id*. (quotation marks and citation omitted).

[49] *Id*. at 337-338.

[50] *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998).

no basis for doubting the credibility of the prosecutor's proffered explanations. Accordingly, this Court will defer to the trial court's conclusion that the prosecutor did not engage in purposeful misconduct.[51]

### B. STATEMENTS AGAINST PENAL INTEREST

We review preserved claims of evidentiary error for an abuse of discretion, which occurs when the trial court "chooses an outcome that is outside the range of reasonable and principled outcomes."[52]

MRE 804 sets forth several exceptions to MRE 802's general rule prohibiting admission of hearsay statements. Relevant to the instant matter is the exception set forth in MRE 804(b)(3), which permits admission of an unavailable declarant's out-of-court statement where the statement is "at the time of its making . . . so far tended to subject the declarant to civil or criminal liability . . . that a reasonable person in the declarant's position would not have made the statement unless believing it to be true."[53] On appeal, McCloud argues that the trial court erred by allowing Williams-Mitchell to testify about statements made by Fields and Webster,[54] implicating not only themselves in Perry's death, but also McCloud. McCloud maintains that these statements were inadmissible because they did not bear sufficient indicia of reliability. We disagree.

Williams-Mitchell testified that Fields, Webster, and Thompson came to her house in the early morning hours of April 20. While there, they discussed the events of the previous day. In particular, they indicated that Fields instructed Thompson to pretend that her car would not start so Perry would help her, Webster shot Perry with a gun belonging to Brown, and McCloud was

---

[51] See also *Knight*, 473 Mich at 344 (stating that the trial court's finding under *Batson*'s third step should be accorded great deference).

[52] *People v Orr*, 275 Mich App 587, 588-589; 739 NW2d 385 (2007).

[53] MRE 804(b)(3).

[54] The hearsay exceptions set forth in MRE 804(b) apply only to statements made by a declarant who is deemed unavailable under MRE 804(a). On appeal, McCloud takes issue with the hearsay statements made by Webster and Fields who, as nontestifying codefendants, were undoubtedly unavailable for purposes of MRE 804. MRE 804(a)(1). However, Williams-Mitchell described the content of a conversation that took place between Webster, Fields, *and* Thompson, without identifying specific statements made by each person. Although McCloud does not raise this issue, we note that statements made by Thompson would not be admissible under MRE 804(b)(3) because, as a testifying witness at trial, she was not an unavailable declarant. In any event, even if this issue had been raised, it would not warrant reversal because the error was harmless. See *People v Smith*, 243 Mich App 657, 680; 625 NW2d 46 (2001) (applying harmless error analysis to evidentiary error). Thompson was cross-examined at length regarding the incident and each defendant's role, and Williams-Mitchell's recollection of the matters discussed was consistent with Thompson's testimony.

supposed to take Perry's car. However, Perry's car would not start, so Thompson had to return to the scene to pick up McCloud.

Although MRE 804(b)(3) does not explicitly speak to those portions of an out-of-court statement that might expose others, in addition to the declarant, to criminal liability, our Supreme Court has held that such statements can fall within the ambit of the rule:

> [W]here . . . the declarant's inculpation of an accomplice is made in the context of a narrative of events, at the declarant's initiative without any prompting or inquiry, that as a whole is clearly against the declarant's penal interest and as such is reliable, the whole statement—including portions that inculpate another—is admissible as substantive evidence at trial pursuant to MRE 804(b)(3).[55]

Contrary to McCloud's argument, the admissibility of such a statement does not depend on additional indicia of trustworthiness because its reliability can be inferred from the self-incriminating nature of the statement itself.[56]

In this case, Williams-Mitchell's testimony described a narrative conversation and there is no indication in the record that the conversation was prompted by an outside inquiry. To the contrary, Williams-Mitchell was the only person present who did not have first-hand knowledge of the incident and she repeatedly stated at trial that she merely heard the conversation and did not actively participate in it. Because Fields and Webster described their own roles in the shooting, the conversation as a whole was clearly contrary to their penal interests. Accordingly, the trial court did not err by allowing the prosecutor to introduce the entirety of Fields's and Webster's hearsay statements.

## C. EXPERT TESTIMONY OF STAN BRUE

This Court reviews a trial court's decision to admit expert testimony for an abuse of discretion.[57] A trial court's ruling regarding an expert's qualification is likewise reviewed for an abuse of discretion.[58] "A trial court abuses its discretion when it chooses an outcome that is outside the range of reasonable and principled outcomes."[59]

---

[55] *People v Poole*, 444 Mich 151, 161; 506 NW2d 505 (1993), overruled in part on other grounds by *People v Taylor*, 482 Mich 368; 759 NW2d 361 (2008).

[56] *Taylor*, 482 Mich at 379. See also *Poole*, 444 Mich at 161 ("The circumstantial guaranty of reliability for declarations against the interest is the assumption that persons do not make statements which are damaging to themselves unless satisfied for good reason that they are true.").

[57] *Dobek*, 274 Mich App at 93.

[58] *People v Steele*, 283 Mich App 472, 480; 769 NW2d 256 (2009).

[59] *Orr*, 275 Mich App at 588-589.

The admissibility of an expert's opinion is governed by MRE 702, which provides:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In determining whether to admit proposed expert testimony, the trial court should ensure that the testimony "(1) will assist the trier of fact to understand a fact in issue, (2) is provided by an expert qualified in the relevant field of knowledge, and (3) is based on reliable data, principles, and methodologies that are applied reliably to the facts of the case."[60]

McCloud contends on appeal that Brue should not have been accepted as an expert witness because he lacked the requisite qualifications. We disagree. The trial court ruled that Brue could testify as an expert in the field of forensic analysis of cellular call detail records. The trial court did not abuse its discretion in this regard, as Brue had received extensive training in the functioning of cellular networks, as well as the computer programs used to analyze call detail records, and had analyzed over 2,700 records in nearly 1,000 criminal investigations since 2010.

McCloud also contends that Brue should not have been permitted to testify regarding cell phone records reflecting communications among defendants, Thompson, and Perry around the time of the shooting. Again, we disagree. Brue presented charts reflecting the common calls or text messages exchanged among those individuals between 2:52 p.m. and 4:52 p.m. on April 19 and the period between November 1, 2014, through July 2, 2015. On cross-examination, Brue agreed that his purpose for preparing the charts was to demonstrate whether the volume of communications between these individuals around the time of the shooting was consistent with their historical patterns. However, apart from agreeing with inferences suggested by defense counsel, Brue did not opine regarding the significance of the records.[61] Rather, he merely presented the voluminous records produced by each individual's cellular service provider—which were already admitted without objection—in a more consolidated format. Because MRE 1006 permits that practice, the trial court did not abuse its discretion by allowing the prosecution to introduce the summarized records through Brue.

---

[60] *People v Kowalski*, 492 Mich 106, 120; 821 NW2d 14 (2012).

[61] Brue agreed that given the frequency of communications between Fields and Thompson between November 2014 and July 2015, it was not unusual that the two would have communicated approximately 20 times on April 19, 2015.

## D. TEXT MESSAGES

We review preserved claims of evidentiary error for an abuse of discretion, which occurs when the court "chooses an outcome that is outside the range of reasonable and principled outcomes."[62] "[A] preserved, nonconstitutional error is not a ground for reversal unless after an examination of the entire cause, it shall affirmatively appear that it is more probable than not that the error was outcome determinative."[63]

As a general rule, all relevant evidence is admissible.[64] Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[65] However, even if evidence is relevant, it may still be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."[66]

McCloud contends that the trial court erred by admitting irrelevant and unfairly prejudicial text messages sent from his phone to Brown's phone on April 18, stating, "Bro say it's the same year Impala that he dropped yup [sic] off in," and, "Same bolor [sic]." According to McCloud, the most powerful, if not only, inference that can be drawn from these messages is that McCloud was aiding and abetting Brown in the commission of an uncharged crime involving the theft of the Impala. Without further context, the relevancy of these messages is unclear. But assuming, without deciding, that the messages lacked relevance or that their prejudicial effect substantially outweighed their probative value, any error arising from the admission of the messages would not entitle McCloud to relief. The prosecution's evidence against McCloud was substantial. Thompson testified that McCloud discussed the plan with Fields and Webster before the shooting; participated in a dry run earlier in the day to identify the location where Thompson would lure Perry; stole Perry's shorts, wallet, and cellphone; and entered Perry's vehicle with the intention of taking it. She also identified him as the person who ran from the scene on foot and a series of photographs taken from his cell phone depicted what appeared to be the areas surrounding the scene as he fled. The parties' cell phone records suggested that McCloud was in regular contact with Brown, Webster, and Fields in the period before and after the robbery and murder and the cellular sites and sectors that serviced McCloud's phone during that period were consistent with being at or near the scene at the time of the shooting. Finally, when McCloud was taken into custody later on April 19 he had Perry's

---

[62] *Orr*, 275 Mich App at 588-589.

[63] *People v Lukity*, 460 Mich 484, 496; 596 NW2d 607 (1999) (quotation marks and citation omitted).

[64] MRE 402.

[65] MRE 401.

[66] MRE 403.

identification and credit card in his possession. In light of the above, it is improbable that the ambiguous text messages affected the outcome of the trial.

## VI. DOCKET NO. 333933 – ANTONIO WEBSTER

### A. SUFFICIENCY OF THE EVIDENCE

This Court reviews challenges to the sufficiency of the evidence de novo.[67] The evidence is viewed "in the light most favorable to the prosecution to determine whether a rational trier of fact could find that the evidence proved the essential elements of the crime beyond a reasonable doubt."[68] Additionally, "[c]ircumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime."[69]

Defendants were jointly charged with felony murder and armed robbery and prosecuted under an aiding and abetting theory, which allows a defendant to be convicted of an offense if

> (1) the crime charged was committed by the defendant or some other person; (2) the defendant performed acts or gave encouragement that assisted the commission of the crime; and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time that [the defendant] gave aid and encouragement.[70]

In challenging the sufficiency of the evidence presented against him, Webster argues on appeal that there was insufficient evidence that he aided and abetted the commission of armed robbery because there was no evidence that he deprived another person of property or shared in the proceeds of the larceny committed by McCloud and Brown. He further reasons that because armed robbery served as the predicate offense for his felony-murder conviction, both of his convictions should be reversed. We disagree. Viewing the evidence in the light most favorable to the prosecution, it is evident that the prosecution presented sufficient evidence from which the jury could find beyond a reasonable doubt that Webster was guilty of armed robbery, even without relying on an aiding and abetting theory.

Armed robbery typically involves "(1) an assault, and (2) a felonious taking of property from the victim's person or presence, while (3) the defendant is armed with a weapon described in the statute."[71] However, when the Legislature amended the statutes defining robbery and

---

[67] *People v Henry (After Remand)*, 305 Mich App 127, 142; 854 NW2d 114 (2014).

[68] *Id*. (quotation marks and citation omitted).

[69] *People v Carines*, 460 Mich 750, 757; 597 NW2d 130 (1999), quoting *People v Allen*, 201 Mich App 98, 100; 505 NW2d 869 (1993).

[70] *People v Moore*, 470 Mich 56, 67-68; 679 NW2d 41 (2004) (quotation marks and citation omitted) (alteration in original).

[71] *Henry (After Remand)*, 305 Mich App at 142 (quotation marks and citation omitted).

armed robbery in 2004, it removed "the words denoting *actual* deprivation of property—'rob, steal and take'—and replaced them with a broader phrase: 'in the course of committing a larceny.' "[72] The Legislature further defined the phrase "in the course of committing a larceny" to include "acts that occur in an attempt to commit the larceny, or during commission of the larceny, or in flight or attempted flight after the commission of the larceny, or in an attempt to retain possession of the property."[73] As our Supreme Court has explained, the revised statutory language evinces the Legislature's clear intent to include attempts to rob within the scope of armed robbery.[74] Accordingly, a defendant can be properly convicted of armed robbery even if the larcenous taking is not completed.[75]

With this understanding in mind, it is apparent that the prosecution presented sufficient evidence to prove that Webster was guilty of armed robbery beyond a reasonable doubt. Thompson testified that when Fields described his plan to rob Perry, Webster said, "Okay," though he did not comment when Fields later said that Perry "had to go." Thus, the jury could infer that, at minimum, Webster was in agreement with Fields's robbery scheme and intended to participate in it. Webster then carried out his role by pointing a gun at Perry, telling him not to move, and shooting him. In doing so, Webster clearly committed an unlawful act that placed Perry in reasonable apprehension of an immediate battery—in other words, an assault[76]—using a dangerous weapon as required by MCL 750.529. Finally, with respect to the requirement that these actions occur in the course of committing a larceny, Thomas testified on cross-examination that the shooter took something from Perry's vehicle before running from the scene. If the jury found Thomas's testimony credible, this would be sufficient evidence that Webster completed the larcenous taking of Perry's property. Even if the jury credited Thompson's testimony identifying McCloud, rather than Webster, as the person who entered Perry's vehicle after the shooting, there was still sufficient evidence regarding this element because Webster could be convicted of armed robbery even if the larcenous taking was not completed.[77] Given the evidence of Webster's earlier assent to Fields's robbery plan and subsequent participation in carrying it out, a rational jury could find him guilty of armed robbery beyond a reasonable doubt.

---

[72] *People v Williams*, 491 Mich 164, 171; 814 NW2d 270 (2012), quoting former MCL 750.529, as amended by 1959 PA 71, and the current version of MCL 750.530, as amended by 2004 PA 128.

[73] MCL 750.530(2).

[74] *Williams*, 491 Mich at 182-183.

[75] *Id*. at 183.

[76] *Henry (After Remand)*, 305 Mich App at 143.

[77] *Williams*, 491 Mich at 183.

## B.  UNTIMELY DISCOVERY AND WITNESS ENDORSEMENT

A trial court's ruling on a motion for continuance or adjournment is reviewed for an abuse of discretion.[78]  Decisions regarding amendment of the prosecution's witness list are also reviewed for an abuse of discretion.[79]  "A trial court abuses its discretion when it chooses an outcome that is outside the range of reasonable and principled outcomes."[80]

Webster contends that he was denied due process and the right to a fair trial as a result of the trial court's handling of two discovery issues that arose during and after jury selection, but before opening statements had been made.  First, Webster takes issue with the length of the adjournment granted by the trial court after the prosecution produced 2,800 pages of discovery on March 19, 2016, when opening statements were scheduled for March 21, 2016.  However, the record reflects that after objecting to an earlier one-day adjournment granted on March 21, 2016, the parties all agreed on March 22, 2016, that they would be prepared to proceed with opening statements after an additional two-day adjournment.  By agreeing that the second adjournment would provide an adequate time to review the newly produced discovery materials, Webster intentionally relinquished a known right, thereby waiving any error arising from the trial court's ruling.[81]

The second basis for Webster's claim of error relates to the late endorsement of Cynthia Fain as a witness for the prosecution.  On March 16, 2016, the third day of jury selection, the prosecution moved to amend its witness list to include Fain.  Pursuant to MCL 767.40a(4), with the court's leave, the prosecution may add or delete a witness from its list of trial witness upon a showing of good cause.[82]  The prosecution acknowledged that it had been aware for some time that Fain had reported her burgundy Impala stolen the day before the murder.  However, because she had been moving between different homeless shelters, the prosecution was unable to locate and interview her until March 15, 2016.  The prosecution's investigator testified that he began looking for Fain in November 2015, checking addresses and phone numbers she provided to the police when reporting her Impala stolen.  He also followed up at prior addresses associated with Fain in other police and state records, including two or three homeless shelters.  The investigator left phone messages with several friends and family members and eventually received a return call from a gentleman who provided a new cell phone number for Fain and agreed to give her the investigator's message.  When the investigator finally got in touch with Fain, she agreed to meet with the prosecution for an interview.  The interview was conducted on March 15, 2016, at which point the prosecution first learned that Fain had an intimate relationship with Webster before the theft and could therefore identify him as the person who stole her Impala.

---

[78] *People v Jackson*, 467 Mich 272, 276; 640 NW2d 665 (2002).

[79] *People v Callon*, 256 Mich App 312, 325-326; 662 NW2d 501 (2003).

[80] *Orr*, 275 Mich App at 588-589.

[81] *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000).

[82] See also *Callon*, 256 Mich App at 327.

Under these circumstances, the trial court did not abuse its discretion by finding that the prosecution had demonstrated good cause to add Fain as a witness. The prosecution's investigator made substantial efforts to locate Fain in advance of trial but was unsuccessful owing in large part to Fain's transient housing circumstances. Although the prosecution suspected that Fain was the owner of the Impala used in the April 19 incident based on the timing of the theft, the significance of Fain's availability as a witness lay in her ability to identify Webster as the person who stole her vehicle. At the time the prosecution filed its witness list, it had no reason to believe that Fain would be able to confidently link any defendant to the Impala because Fain did not disclose that she knew the thief when she reported the incident to the police.

Moreover, the court's ruling did not unfairly prejudice Webster.[83] Because Webster's former relations with Fain were known to him, her testimony should not have come as a surprise. Additionally, when the trial court ruled that the prosecution could add Fain to its witness list, it also appointed an investigator to conduct a second interview on Webster's behalf, thereby ensuring that Webster's attorney was prepared to cross-examine Fain when she testified over two weeks later.

## C. DOUBLE JEOPARDY

In a supplemental brief filed on his own behalf, Webster also argues that his constitutional protection against double jeopardy was violated when he was convicted of both felony murder and second-degree murder stemming from Perry's death. Although Webster correctly notes that the federal and state Constitutions prohibit multiple homicide convictions arising from the death of a single victim, the appropriate remedy for such a constitutional violation is to vacate one of the convictions.[84] Because the trial court vacated Webster's second-degree murder conviction at his sentencing hearing, this claim of error is moot.

## D. EXPERT TESTIMONY OF DR. AUNEESH GUPTA

Next, Webster argues in his Standard 4 brief that the medical examiner who performed Perry's autopsy should not have been permitted to opine regarding the distance from which Perry was shot. We disagree.

As already noted, we review the trial court's decision to admit expert testimony[85] and its ruling regarding an expert's qualification[86] for an abuse of discretion. "A trial court abuses its

---

[83] See *id*. at 328 (noting that the defendant must demonstrate that the trial court's decision to allow late endorsement of witness resulted in prejudice).

[84] See *Clark*, 243 Mich App at 429-430.

[85] *Dobek*, 274 Mich App at 93.

[86] *Steele*, 283 Mich App at 480.

discretion when it chooses an outcome that is outside the range of reasonable and principled outcomes."[87]

The parties stipulated that Dr. Gupta was an expert in the field of forensic pathology. Dr. Gupta testified that Perry died as a result of multiple gunshot wounds, but stated that his conclusion regarding the range of fire was indeterminate. However, he opined that the shooter was more than 18 to 24 inches away, based on the absence of soot or stippling on Perry's skin. According to Webster, Dr. Gupta was not qualified to render that opinion because he lacked expertise relating to firearms. This position is unavailing because an expert can be qualified by "knowledge, skill, experience, training, or education,"[88] and Dr. Gupta testified that his training included hands-on experience and reading about the characteristics of gunshot wounds to determine whether a firearm was discharged at close, intermediate, or indeterminate range. In any event, when a witness is properly qualified as an expert, as Dr. Gupta was in this case, "[g]aps or weaknesses in the witness' expertise are a fit subject for cross-examination, and go to the weight of his testimony, not its admissibility."[89] The trial court did not abuse its discretion in this regard.

## E. PHOTOGRAPHS

Lastly, Webster argues that the trial court erred by excluding two photographs of Thompson from evidence at trial. The photographs at issue were not provided to this Court for review, but the trial court described them as "very provocative pictures" depicting Thompson "with very limited clothing on . . . ." The trial court precluded Webster's use of the photographs, reasoning that they had minimal probative value and that any such value was "extremely" outweighed by the risk of unfair prejudice. In articulating his claim of appeal, Webster merely states that the trial court erred because the photographs could have been used to impeach Thomas and "set forth a defense," but does not attempt to explain how the photographs were relevant or why they should not have been excluded under MRE 403. By failing to rationalize the basis for his claim or furnish this Court with a sufficient record to review, Webster has effectively abandoned appellate review of the purported err.[90]

---

[87] *Orr*, 275 Mich App at 588-589.

[88] MRE 702.

[89] *People v Gambrell*, 429 Mich 401, 408; 415 NW2d 202 (1987).

[90] *Kelly*, 231 Mich App at 640-641 ("An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims . . . .").

## VII. CONCLUSION

In Docket Nos. 333931, 333932, and 333933, we affirm defendants' convictions and sentences. We also affirm Brown's convictions and sentences in Docket No. 333927, but remand his case to the trial court for the ministerial task of correcting Brown's SIR consistent with this opinion. We do not retain jurisdiction.

/s/ Michael J. Talbot
/s/ Stephen L. Borrello
/s/ Michael J. Riordan